SLOSS-SHEFFIELD STEEL & IRON COMPANY, Respondent, vs. WISCONSIN FOUNDRY & MACHINE COMPANY, Appellant.

*April 7—May 12, 1925.*

*Sales: Instalment deliveries: Breach of contract by buyer: Damages: Attempted repudiation.*

1. The measure of damages for breach of an executory agreement of sale is the difference between the contract price and the market price of the goods at the time and place where the contract should have been performed.   p. 36.

2. Contracts of purchase of pig iron which was to be shipped during certain quarters of the year are construed, in view of the interpretation placed upon them by the contracting parties, as calling for shipments from time to time as directed by the buyer, but not to confer upon the seller the right to make deliveries until the last day of each quarter.   p. 37.

3. Notification by the buyer that he will not accept goods under a contract calling for future deliveries is merely repudiation, which may be treated as a breach or not, at the option of the seller.   p. 37.

4. The seller having chosen to keep the contracts alive notwithstanding the buyer had attempted to repudiate, damages were properly assessed as of the time of delivery.   p. 38.

APPEAL from a judgment of the superior court of Dane county: AUGUST C. HOPPMANN, Judge. *Affirmed.*

For the appellant there was a brief by *Hill, Thomann & Beckwith* of Madison, and oral argument by *D. V. W. Beckwith.*

For the respondent there was a brief by *Sanborn, Blake & Aberg* of Madison, and oral argument by *John B. Sanborn* and *W. J. P. Aberg.*

OWEN, J.   This is an appeal from a judgment of the superior court of Dane county awarding plaintiff and respondent damages against the defendant and appellant for defendant's breach of two contracts of purchase of certain pig iron from the plaintiff.   The only question presented is whether the court applied the proper measure of damages.

On August 5, 1920, the parties entered into a contract whereby plaintiff agreed to sell and deliver to the defendant 150 tons of pig iron at $46.25 per ton, delivery to be made f. o. b. cars at Birmingham, Alabama, and shipments to be made during the last quarter of 1920.  The defendant agreed to pay therefor $46.25 a ton "cash thirty days from average date of monthly deliveries."   The contract also provided that "each month's deliveries shall be treated as a separate contract, independent of deliveries for other months."

Another contract of exact tenor was entered into between the same parties the same day for the sale and delivery of 150 tons of pig iron during the first quarter of 1921.   The plaintiff delivered fifty tons under this contract in the month of October.   On October 11, 1920, the defendant notified plaintiff not to make any further shipments on these contracts until defendant notified plaintiff, as defendant then had all the iron on hand it could handle at that time.   Plaintiff acknowledged receipt of this letter and expressed the hope that it would be advised by the 1st of November as to what time in November defendant would be prepared to take care of the November quota.   On November 9th plaintiff, having heard nothing from the defendant, wrote defendant that "we will appreciate your advice by return mail as to just what time during the month of November it will be satisfactory to you to have us make shipment of this tonnage." Plaintiff heard nothing from defendant until November 22d, when it received this telegram: "Car Santa Fe 29432 arrived today.   Cannot accept it.   This shipment made without order from us.   We refuse to accept any further shipment on two contracts.   Wire Northwestern Railroad disposition of car on track to save demurrage."   It appears that this car

had not been shipped by the plaintiff and it had nothing to do with it. Plaintiff so wrote defendant, and from time to time during the month of December made frequent demands upon the defendant to authorize further shipments under the contract. Plaintiff heard nothing further from defendant until January 14, 1921, when it received a communication from defendant's attorneys in which they said: "On behalf of our clients we desire to inform you that they will not accept any further shipments of iron under their contracts with you. You were wired to the same effect on November 28, 1920." The attitude of the defendant, as indicated by this letter, continued up to the 31st day of March, 1921. At no time did the defendant authorize any further shipments under the contracts.

The court held that under the first contract the date of delivery was December 31st and that under the second contract the date of delivery was March 31st, and awarded plaintiff as damages the difference between the contract price and the market price of pig iron at Birmingham on those dates. As already stated, the only question presented is whether this was the proper measure of damages.

It is a general proposition that where the buyer of goods under an executory agreement breaks the contract by refusing to accept the goods, the measure of damages is the difference between the contract price and the market price of the goods at the time when and the place where the contract should have been performed. 2 Williston, Sales (2d ed.) § 582; *Schuenemann v. John G. Wollaeger Co.* 170 Wis. 616, 176 N. W. 59; *Gwin v. Hopkinsville M. Co.* 190 Ala. 346, 67 South. 382; *Crandall-Pettee Co. v. Jebeles & Colias C. Co.* 195 Ala. 152, 69 South. 964; sec. 121.64, Stats. The only serious question presented by the facts of this case is when were the goods deliverable. The contracts merely provide for 150 tons of pig iron during the last quarter of 1920 and 150 tons during the first quarter of 1921. The contracts plainly contemplate that delivery shall take place from

time to time during such periods. The contracts do not expressly provide, however, that any particular amount shall be delivered at any particular time, nor that any number of tons shall be delivered during any particular month. The correspondence indicates that the parties themselves contemplated that the pig iron should be delivered as called for by the defendant. This is indicated by the fact that the defendant wrote to the plaintiff not to deliver any more iron until notified. The defendant thus claimed the right to indicate when the iron should be delivered. That the plaintiff also placed a similar construction upon the contracts is indicated by the fact that it did not assume to make any shipments in the absence of directions from the defendant and that it continually appealed to defendant for shipping directions. There was no time during either three-months period when plaintiff had a right to deliver any amount of pig iron and compel the acceptance thereof by the defendant. It could not have delivered any of the pig iron prior to the last day of the period and caused a breach of the contract on the part of the defendant by its refusal to accept the shipment. We construe these contracts as calling for shipments from time to time pursuant to directions of defendant, and that the plaintiff had no absolute right to deliver the iron until the last day of each quarter. Until the last day of each quarter, therefore, there was no right on the part of the plaintiff to compel acceptance, and there could have been no breach on the part of the defendant until the last day of each quarter.

Appellant also contends that the breaches occurred on November 22d when the defendant telegraphed the plaintiff that it would not accept any further shipments under the two contracts, and if the breaches did not occur at that time the second contract was certainly breached on January 14th when defendant's attorneys wrote plaintiff that the defendant would not accept any further shipments of iron under the contracts. These notifications were repudiations rather than

breaches of the contracts. They authorized the plaintiff to treat the contracts as terminated, but it was not bound to do so. One party to a contract cannot terminate it without the consent of the other. In discussing this subject Mr. Williston, in his work on Sales (2d ed.), § 584, says:

"The rule has been broadly laid down in England that in case of notice to a promisee of a promisor's intention not to perform his contract, 'the promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance.'" See, also, *Washburn-Crosby Co. v. Kubiak*, 175 Wis. 291, 185 N. W. 162.

This rule is supported by well-nigh universal authority in this country and, we think, is recognized in the Alabama cases already cited. Even though the communications of November 22d and January 14th constituted repudiations of the contracts on the part of defendant, plaintiff chose to keep the contracts alive, and the measure of damages appl:· _ble to the situation is not at all affected by the repudiations of the defendant. The plaintiff is entitled to the difference between the contract price and the market price of the goods at the time and place of delivery. The trial court correctly applied this rule, and the judgment cannot be disturbed.

*By the Court.*—Judgment affirmed.